IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| | § |
| Plaintiff-Respondent, | § |
| | § |
| V. | § CRIMINAL ACTION NO. H-03-89-8 |
| | § |
| GERMAN ARIAS, | § |
| | § |
| Defendant-Movant | § |

**MEMORANDUM AND RECOMMENDATION**

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255[1] is Movant German Arias' "Motion for Downward Departure for Unforseen Collateral Consequences in Punishment as Alien Not Suffered by Identical United States Citizen (Deportable Alien Pursuant to 18 U.S.C. § 3553)" (Document No. 392), which is construed as a request for relief under 28 U.S.C. § 2255, and the United States' Answer and Motion to Dismiss In Light of Waiver Provisions in Plea Agreement (Document No. 398). After reviewing Movant's § 2255 Motion, the Government's Answer and Motion to Dismiss, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion to Dismiss (Document No. 398) be

---

[1] German Arias' Motion has been characterized by the docket clerk as one filed under 28 U.S.C. § 2255. Based on this characterization, pursuant to *Castro v. United States*, 540 U.S. 375 (2003), is advised as follows: (1) his motion was been construed as a Motion to Vacate, Set Aside or Correct Sentence; (2) as a result of this characterization, should Arias later seek to assert additional claims under § 2255, any subsequently filed motions will be construed as successive before the district court, and he will be required to seek, and acquire approval from the Fifth Circuit Court of Appeals to pursue a successive § 2255 motion.

GRANTED, that Movant's Motion, construed as a Motion to Vacate, Set Aside, or Correct Sentence (Document No. 392) be DENIED, and that this § 2255 proceeding be DISMISSED.

## I.  Procedural History

Movant German Arias ("Arias"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255. This is Arias' first attempt at § 2255 relief.

On March 21, 2006, Arias, Bonifacio Hernandez, Juan Antonio Escobar, Leon Baldomero DeLeon, Sugentino Percel, Eric Vasquez, Leonardo Arcemio Garcia and Jesus Alejandro Osorio were charged by Indictment with drug trafficking activities. (Document No. 22). Arias was charged with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(ii) (Count one), and possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii) and 18 U.S.C. § 2 (Count two). (Document No. 22). On June 30, 2006, Arias, pursuant to a written plea agreement, pleaded guilty to Count one of the Indictment. (Document Nos. 105, Transcript of Re-Arraignment, No. 353). Under the written plea agreement pursuant to Rule 11(c)(1)(A) and (B), the Government agreed to: dismiss the remaining count of the Indictment at sentencing, not oppose reductions for acceptance of responsibility, and recommend that Arias be sentenced at the low end of the guideline range. Arias agreed to cooperate, debrief, and if necessary, to testify under U.S.S.G. § 5K1.1. In addition, Arias agreed to forfeiture of property. Also, Arias waived his appellate rights, including the right to collaterally attack his conviction and sentence. With respect to the waiver of

appeal rights, including the right to bring a § 2255 motion, the written plea agreement provides in pertinent part:

Waiver of Appeal

> 9. Defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined **on any grounds set forth in 18 U.S.C. § 3742**. Additionally, the defendant is aware that 28 U.S.C. § 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final. The defendant waives the right to contest his/her conviction or sentence by means of any post-conviction proceeding.
>
> 10. In agreeing to these waivers, defendant is aware that a sentence has not yet been determined by the Court. The defendant is also aware that any estimate of the possible sentencing range under the USSG that he/she may have received from his/her counsel, the United States or the United States Probation Office ("USPO"), is a prediction, not a promise, **did not induce his/her guilty plea**, and is not binding on the United States, the USPO, or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the USSG are "effectively advisory" to the Court. United States v. Booker, 543 U.S. 220, 245 (2005). Accordingly, defendant understands that, although the Court must consult the USSG and must take them into account when sentencing defendant, Booker, 543 U.S. at 264, the Court is not bound to follow the USSG nor sentence defendant within the calculated guideline range.
>
> 11. The Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement. (Document No. 109, p. 4-5) (emphasis in original).

In addition, Arias and his attorney, Lazaro Izaguirre, executed an addendum to the written Plea Agreement, which states in pertinent part:

> I have fully explained to defendant his/her rights with respect to the pending Indictment. I have fully reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to defendant the provisions of those Guidelines which may apply in this case. I have also explained to defendant that the USSG are only advisory and the court may sentence defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with

>defendant. To my knowledge, defendant's decision to enter into this agreement is an informed and voluntary one.
>
>I have consulted with my attorney and fully understand all my rights with respect to the Indictment pending against me. My attorney has fully explained and I understand all my rights with respect to the provisions of the United States Sentencing Commission's <u>Guidelines Manual</u> which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms. (Document No. 109, p. 13).

At Arias' June 30, 2006, Rearraignment, the Court engaged in an extended colloquy with Arias to ensure that he had read the written Plea Agreement and had conferred with his attorney about the contents of the Plea Agreement. The Court also advised Arias of the consequences of his plea, including the sentence he faced, the manner in which his sentence would be calculated, the factual basis of the plea, and the waiver provisions:

>The Court: All right. Would you tell us what — just in general, what the terms of the plea agreement with Mr. Arias are?
>
>Mr. Mason: Yes, your Honor. For Mr. Arias, the United States is agreeing to move for the dismissal of the remaining count at the time of sentencing, to not oppose reductions for acceptance of responsibility and timely notice of intent to plead guilty, and to recommend sentencing at the low end of the guideline range.
>
>In return, in general, the defendant is agreeing to cooperate, debrief and, if necessary, to testify under 5K1.1 of the sentencing guidelines and if he provides substantial assistance in the United States' sole discretion, we'll file a motion for departure. Additionally, he's agreeing to the forfeiture of property, if any, and a waiver of appellate rights, including collateral attacks.
>
>The Court: All right. Mr. Arias, does that sound like a fair and accurate summary of the written plea agreement that your propose to enter into this morning?
>
>Defendant Arias: Yes.
>
>The Court: Has someone translated the written plea agreement for you from English into Spanish?
>
>Defendant Arias: Yes.

4

The Court: And have you discussed it with Mr. Izaguirre, your attorney?

Defendant Arias: (Nods head).

The Court: Yes?

Defendant Arias: Yes.

The Court: Do you understand or believe that you understand what it is you are agreeing to in the plea agreement and what it is the government is agreeing to in the plea agreement?

Defendant Arias: Yes.

The Court: Do the agreements that you have with the government, do those agreements – are those agreements all of the agreements that you have with the government? In other words, I'm trying to find out if there's some other agreement that didn't get written down in the plea agreement, somebody made you some other promise or assurance or agreed to do something for you that didn't get written down in the written plea agreement. Anything like that out there?

Defendant Arias: I do not understand.

The Court: You don't understand?

The Defendant: I didn't hear.

The Interpreter: Do you want me to do it alfresco?

The Court: Yes. Yes, let's do it alfresco.

What I'm trying to understand, I want to know, you have a written plea agreement here with the government that you propose to sign and in that written plea agreement there are agreements that have been made between you and the government. You've agreed to some things, the government has agreed to some things. What I'm trying to find out is, is there some other agreement or promise or understanding that was made to you or that you have that didn't get written down in the plea agreement?

Defendant Arias: No.

The Court: This is the entire totality of this agreement you have with the government with reference to your plea of guilty this morning?

5

Defendant Arias: Yes.

      *            *

The Court: All right. Do each of you understand that under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow to determine what the sentence will be in a criminal case? Do you understand that, Mr. Arias?

Defendant Arias: Yes.

The Court: Have each of you discussed with your attorney how those sentencing guidelines may apply in your case?
      *            *

Mr. Arias, have you discussed the case with Mr. Izaguirre?

Defendant Arias: Yes.

The Court: All right. Do each of you understand that the sentencing guidelines are no longer mandatory but are advisory?

      *            *

Defendant Arias: Yes.

      *            *

The Court: All right. And that means that a probation officer will be ordered to conduct an investigation of your case and to write a presentence report that will assist me in sentencing. Do you understand that, Mr. Arias?

Defendant Arias: Yes.

The Court: All right. And for that reason I will not be able to tell you what your sentence is today. Do you understand that, [Mr. Arias?]

Defendant Arias: Yes.

The Court: All right. Once the probation officer has written the presentence report, you and your attorney will get a copy of that report and the government will also get a copy of that report. And each of you will be given an opportunity to make objections to that presentence report. We will then have a sentencing hearing. At

that hearing, I will rule on any objections that may be made to the presentence report. I will also rule on any motions that may be made, any recommendations that may be made, or any other matters that might be brought to my attention that might have an impact on the kind of sentence that you receive.  Do you understand that, [Mr. Arias]?

Defendant Arias:  Yes.

The Court:  And at the conclusion of that sentencing hearing, I will then be in a position to determine what your sentence will be. And when I pronounce sentence, it may be that the sentence I give you is more severe than the one that you and your attorney may have estimated you might get when you were discussing how the guidelines might apply in your case. Do you understand that, [Mr. Arias]?

Defendant Arias:  Yes.

The Court:  And if you receive a sentence that is more severe than the one you're expecting, do each of you understand that you will not be given an opportunity to withdraw your plea of guilty?  Do you understand that, [Mr. Arias]?

Defendant Arias: Yes.

\*

The Court:  Do each of you understand that the guidelines are trumped by statutes that require the Court to give mandatory minimum sentences in some cases, particularly in drug related cases?  Do you understand that, [Mr. Arias]?

Defendant Arias:  Yes.

The Court:  All right.  And because each of your cases would be subject to those mandatory minimums, no matter what the guidelines might tell me would be a guideline sentence, I would be required to give you at least ten years in prison. Do you understand that, [Mr. Arias]?

Defendant Arias:  Yes.

The Court:  All right.  And do each of you also understand that under some circumstances the Court would have the authority to depart from the sentencing guidelines and to impose a sentence that is either more severe or less severe than the guidelines sentence?  Do you understand that, [Mr. Arias]?

Defendant Arias:  Yes.

       \*                               \*

> The Court: All right. Do each of you understand that under some circumstances you or the government would have the right to appeal any sentence that I impose? Do you understand that, [Mr. Arias]?
>
> Defendant Arias: Yes.
>
> **The Court: But, Mr. Arias, do you also understand that by entering the written plea agreement that you propose to enter into, you will be waiving or giving up your right to appeal or collaterally attack by way of habeas corpus or any other way any sentence that I impose? Do you understand that?**
>
> **Defendant Arias: Yes.** (Document No. 353, pp. 8-11, 15-19) (emphasis added).

With respect to the factual basis for the plea, the records shows:

> The Court: All right. Mr. Mason, tell me what it is the government's prepared to prove if we went to trial in the case against those two defendants.
>
> Mr. Mason: Yes, your Honor. If called upon to do so, the United States would be able to prove beyond a reasonable doubt that beginning on or about the 20th of February 2006 and continuing up to and about the 21st of February 2006, Bonifacio Hernandez and German Arias, in the Houston Division of the Southern District of Texas, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with Juan Antonio Escobar, Leon Baldomero Deleon, Sugentino Percel, Eric Vasquez, Leonardo Arcemio Garcia, and Jesus Alejandro Osorio to possess with the intent to distribute cocaine, a Schedule II controlled substance, in an amount greater than 5 kilograms.
>
> In addition, on or about the 21st of February 2006, Mr. Hernandez, aiding, assisting, and abetting his codefendants, did unlawfully, knowingly, and intentionally possess with the intent to distribute cocaine, in an amount greater than 5 kilograms.
>
>       \*                              \*
>
> Specifically, on or about the 21st of February 2006, Mr. Hernandez, Escobar, and DeLeon met inside the Bravos restaurant at the corner of Bingle and Northwest Freeway in Houston in discuss an impending cocaine deal.
>
> After meeting, Mr. Escobar and DeLeon left in a 1993 green Ford Explorer and Mr. Hernandez left in a 1999 gray Jeep Cherokee. The Explorer went to 7430 Weatherhill in Houston, where Escobar and DeLeon got out and entered the residence.

The prior day, Mr. Garcia had transported cocaine from Mexico to this Weatherhill address in a white Dodge pickup with a hidden compartment and parked the Dodge in the garage. Mr. Escobar and Mr. DeLeon took the cocaine out of the hidden compartment and put some in two black plastic trash bags.

Back on the 21st of February at approximately 5:00 p.m., Mr. Escobar and DeLeon walked from the Weatherhill residence carrying a black canvas bag containing an electric money counter and two black plastic trash bags which contained cocaine.

Mr. Garcia was to wait at the Weatherhill residence until Mr. Escobar and DeLeon collected cocaine proceeds to transport to Mexico.

Mr. Escobar and DeLeon were to put money in the Dodge's hidden compartment for Mr. Garcia to transport back to Mexico.

Mr. Escobar and DeLeon drove from the Weatherhill residence to 8915 Alejo in Houston where the black canvas bag and the two black plastic bags were carried inside. Mr. Escobar then drove back to the Bravos restaurant.

At the restaurant, Mr. Hernandez, Percel, and Vasquez got into the Explorer and were driven by Escobar to the Alejo residence. Mr. Escobar then drove to 3737 Watonga in Houston where he picked up Osorio and Arias and drove them back to the Alejo residence.

Shortly thereafter, Mr. Escobar, Osorio, and Vasquez went back to 3737 Watonga where Osorio and Vasquez picked up a 2005 gray minivan and returned back to the Alejo residence, where the minivan went into the attached garage and the Explorer in the driveway.

\*                                                                              \*

While at the residence, Percel, Vasquez, and Arias packaged kilogram-sized bricks of cocaine into sealed bags, loading ten of those bricks into a hidden compartment in the minivan. Mr. Escobar, Hernandez, DeLeon and Osorio all at times were in the kitchen/dining room area where the cocaine was being packaged.

At approximately 11:10 p.m. that day, Mr. Escobar left the Alejo residence, got in the Explorer and pulled out of the driveway. At about the same time, the garage door opened and the minivan pulled out.

Shortly after departing from the Alejo residence, the minivan was stopped by Harris County deputies on Bingle Road. Inside the minivan was Arias, who was driving, and Osorio, who was the front passenger.

During the subsequent search, officers located ten kilogram-sized bricks of suspected cocaine from the right, rear quarter panel of the minivan where the narcotics dog had alerted.

Lab testing confirmed that the substance recovered was cocaine with a net weight of 9.89 kilograms. These bricks were wrapped in green cellophane and heat sealed in a bag and had axle grease on them.

While this traffic stop was occurring, the Explorer did a U-turn, drove past the stopped minivan and drove off in the direction of the Alejo residence. As the Explorer was driving down the street of the Alejo residence, the front door opened and DeLeon, Percel, Hernandez, and Vasquez left the residence, quickly went down the street and got into the Explorer. The Explorer then drove exceedingly fast through the neighborhood.

The Explorer was followed back to 3737 Watonga, where it was stopped by the Houston Police Department. Escobar, DeLeon, Percel, Hernandez, Vasquez were also inside the Explorer.

Escobar had called Hernandez and advised him of the traffic stop of the minivan, telling Hernandez to get out of the Alejo residence, and that he, Escobar, would pick them up. After Escobar picked up DeLeon, Hernandez, Vasquez, and Percel, they all discussed what was going — what they were going to do and where they would go to avoid law enforcement.

At the Alejo residence officers found 25 kilogram-sized bricks of suspected cocaine from the front bedroom. Lab testing confirmed that the substance was cocaine with a new weight of 24.9 kilograms. These bricks were identical to the ten bricks of cocaine seized from the minivan in size, shape, and wrapping.

In addition, an electronic money counter was found inside a black canvas bag. Other items recovered included green cellophane from the kitchen/dining room area; heat sealing bags; axle grease/ latex gloves, both used and unused; a heat sealing machine; paper towel with axle grease; and a wrench and screwdriver sets.

At the Weatherhill residence, where Garcia was still present, officers found 8 kilogram-sized bricks of suspected cocaine from the master bedroom closet. Lab testing confirmed that the substance was cocaine with a net weight of 7.8 kilograms. Also recovered was approximately $50,000 in U.S. currency from the master bedroom; green cellophane from the kitchen; a heat sealing machine from the back bedroom; a suspected drug ledger from the master bedroom; and two firearms, a Ruger 9 millimeter and a .45 caliber from the front bedroom; an electronic scale from

the kitchen area; and Garcia's 1997 Dodge pickup, which had a hidden compartment built between the backseat and the payload.

*                                                     *

The Court: Good. All right. Mr. Arias, tell me in your own words what it is you did to commit the crime you are pleading guilty to this morning.

Defendant Arias: I was going to drive that van from that place to the parking lot at Osorio's apartment.

The Court: And the van had cocaine in it, correct?

Defendant Arias: Yes.  (Document No. 353, pp. 25-31, 33)

Prior to sentencing, a pre-sentence investigation report ("PSR") was prepared to which Arias filed written objections.[2] (Document Nos. 213, 217). Pursuant to the PSR, Arias' guideline sentencing range was calculated as follows: (1) Arias had a base offense level of 34. (2) Because Arias met the criteria set forth in divisions (1)-(5) of U.S.S.G. § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), pursuant to U.S.S.G. § 2D1.1(b)(7), his offense level was reduced by two levels. (3) Because Arias accepted responsibility and did so in a timely manner pursuant to U.S.S.G. § 3E1.1(a) and (b), his offense level was reduced three levels. (4) With an adjusted offense level of 29, and with a criminal history of category I, Arias had a guideline sentence range of 87 to 108 months imprisonment. Prior to sentencing, the Government filed an Amended Motion for Downward Departure. (Document No. 259). Arias was sentenced to a term of imprisonment of 51 months, to be followed by a three year term of supervised release, and a special

---

[2] Arias objected (Document No. 213) to several sections of the PSR including the relevant conduct assessment, and the offense level computations. According to Arias, he should have only been held accountable for the sale and negotiation of 10 kilograms of cocaine, which was the amount seized in the minivan. Arias maintains that this would have resulted in an adjusted offense level of 27, and with a criminal history of category I, a guideline range of 70 to 87 months imprisonment.

11

assessment of $100. (Document No. 270). Judgment was entered on March 14, 2007. (Document No. 283). Arias' conviction became final on March 28, 2007. On October 31, 2007, Arias filed the instant motion, which was captioned as a "Motion for Downward Departure for Unforeseen Collateral Consequences in Punishment as Alien Not Suffered by Identical United States Citizen (Deportable Alien Pursuant to 18 U.S.C. § 3553)." (Document No. 392). The Government has answered and has moved to dismiss the instant action on the ground that Arias, as part of his written Plea Agreement, waived the right to bring a motion under § 2255, and that his written Plea Agreement should be enforced. (Document No. 398). The Government further argues that even assuming that Arias had not waived his right to pursue relief under § 2255, he nevertheless is not entitled relief on his claim. This § 2255 proceeding is ripe for ruling.

## II. Discussion

### A. Wavier

A defendant's waiver of his statutory right to collaterally challenge his conviction with a motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255, like a waiver by a defendant of his right to appeal, is generally enforceable if the waiver is both knowing and voluntary. *United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994) (Enforcing defendant's voluntary and knowing waiver of § 2255); *United States v. McKinney,* 406 F.3d 744, 746-47 & n.5 (5th Cir. 2005) (Enforcing, post-*Booker*, a waiver of appeal right that was signed prior to the issuance of *Booker)*. Such waivers, however, do not "preclude review of a sentence that exceeds the statutory maximum." *United States v. Hollins*, 97 Fed. Appx. 477, 479 (5th Cir. 2004). In the context of a plea agreement waiver, a sentence exceeds the statutory maximum only when it exceeds the maximum allowed by statute. *United States v. Bond*, 414 F.3d 542, 546 (5th Cir. 2005); *United States v. Cortez*, 413 F.3d

502, 503 (5th Cir.), *cert. denied*, 126 S.Ct. 502 (2005). In addition, when a defendant alleges that his counsel was ineffective in negotiating a plea agreement, such ineffectiveness claims are not barred by the waiver. *See United States v. White,* 307 F.3d 336, 343 (5th Cir. 2002) ("[i]neffective assistance of counsel argument survives a waiver of appeal only when the claimed assistance directly affected the validity of that waiver or the plea itself."); *United States v. Cockerham,* 237 F.3d 1179, 1187 (10th Cir. 2001) ("[W]e hold that a plea agreement waiver of postconviction rights does not waive the right to bring a § 2255 petition based on ineffective assistance of counsel claims challenging the validity of the plea or the waiver. Collateral attacks based on ineffective assistance of counsel claims that are characterized as falling outside that category are waivable."), *cert. denied*, 534 U.S. 1085 (2002); *DeRoo v. United States*, 223 F.3d 919, 924 (8th Cir. 2000) ("A defendant's plea agreement waiver of the right to seek section 2255 post-conviction relief does not waive defendant's right to argue, pursuant to that section, that the decision to enter into the plea was not knowing and voluntary because it was the result of ineffective assistance of counsel."); *Mason v. United States,* 211 F.3d 1065, 1069 (7th Cir. 2000) (where the ineffectiveness claims raised in a § 2255 motion relate to counsel's performance at sentencing, the defendant's plea agreement waiver of this right to challenge his conviction in a § 2255 proceeding is enforceable), *cert. denied*, 531 U.S. 1175 (2001).[3]

---

[3] There are some other limited situations in which a plea agreement waiver of the right to seek collateral review under § 2255 is not enforceable, such as where the sentence imposed violates the terms of the plea agreement, the sentence is illegal, or the Government has suppressed exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). *See DeRoo*, 223 F.3d at 923 ("defendants cannot waive their right to appeal an illegal sentence or a sentence imposed in violation of the terms of an agreement"); *United States v. Baramdyka,* 95 F.3d 840, 843 (9th Cir. 1996) ("the waiver of a right to appeal may be subject to certain exceptions such as claims involving a breach of the plea agreement, racial disparity in sentencing among codefendants or an illegal sentence imposed in excess of a maximum statutory penalty"), *cert. denied,* 520 U.S. 1132 (1997); *United States v. Hollins*, 97 Fed. Appx. 477, 479 (5th Cir. 2004) (Waiver does not preclude review of a sentence that exceeds the statutory maximum). None of those circumstances is at issue in this proceeding.

Ineffective assistance of counsel claims, including challenges to counsel's performance at sentencing, which do not relate to the validity of the Plea Agreement and waiver, can be waived. *White,* 307 F.3d at 343.  Otherwise, "[i]f all ineffective assistance of counsel claims were immune from waiver, any complaint about the process could be brought in a collateral attack by merely challenging the attorney's failure to achieve the desired result.  A knowing and intelligent waiver should not be so easily evaded." *White,* 307 F.3d at 344.

Here, pursuant to a written Plea Agreement, Arias waived his right to appeal and waived his right to collaterally attack his plea, conviction and sentence.  As discussed above, the written Plea Agreement was explicit with respect to the waiver of the right to appeal and to pursue collateral relief. (Document No. 109, ¶ 9-11).

In addition, at his Rearraignment on June 30, 2006, the Court engaged in an extended colloquy to ensure that Arias was competent to participate in the Rearraignment proceedings, had read the written Plea Agreement, discussed the contents of the written Plea Agreement with counsel and understood the agreement, that no promises had been made to induce his plea, that he understood the offense to which he was pleading guilty, the maximum sentence he faced, the rights he was giving up by virtue of his guilty plea, and the factual basis for the charges and his guilty plea. The Court also advised Arias about the waiver provisions.  Based on Arias' responses during the lengthy colloquy, Judge Harmon concluded that Arias' guilty plea and waiver of his right to appeal and collaterally attack his conviction and/or sentence was knowing and voluntary.

Given Arias' statements on the record, which carry a strong presumption of verity, *Blackledge v. Allison,* 431 U.S. 63, 74 (1977), that he had read and discussed the written Plea Agreement with his counsel, that he understood the statutory and constitutional rights which he was waiving, that he

14

understood his possible range of punishment and how his sentence would be computed, and that he understood that he had waived his right to appeal and to file a post conviction proceeding, Arias has not shown that his plea was not counseled, knowing and voluntary. Thus, upon this record, Arias' plea agreement waiver of his right to collaterally attack his conviction with a § 2255 motion is enforceable. Arias' sentence does not exceed the statutory maximum – that is, the maximum sentence allowed by statute, *see* 18 U.S.C.§ 2252A(a)(5)(B) (maximum term of life imprisonment), and does not constitute an upward departure from the Sentencing Guidelines. *See United States v. McKinney*, 406 F.3d 744, 746-47 (5th Cir. 2005). Because Arias' plea agreement, and waiver of appeal and collateral rights contained therein, were knowingly, voluntarily, and intelligently entered, because Arias has waived his right to bring a § 2255 motion, and because that waiver is valid and should be enforced, it serves as a bar to the instant § 2255 motion. Upon this record, the Government is entitled to summary judgment on Arias' claims pursuant to Arias' plea agreement waiver[4] s*ee Mason v. United States*, 211 F.3d 1065, 1069 (7th Cir. 2000); *Davila*, 258 F.3d at 451-52; *United States v. Nguyen*, 2005 WL 14090 (E.D. La. 2005); *Morua v. United States*, 2005 WL 1745474 (S.D.Tex. 2005) (Hittner, J.); *United States v. Rohmfeld*, 2006 WL 126636 (S.D.Tex. 2006) (Jack, J.), and this § 2255 proceeding is subject to dismissal.

### B. Merits

---

[4] Under Rule 12 of the Rules governing § 2255 motions, the Federal Rules of Civil Procedure, including Rule 56, which provides for summary judgment, are generally applicable. Under Rule 56(c), summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Here, because the evidence in the record shows that Arias' plea was knowing and voluntary, there is no genuine issue of material fact relative to the validity of Arias' guilty plea or his waiver of his direct appeal and waiver of pursuing collateral review under § 2255. Summary judgment is therefore warranted on Arias' plea agreement waivers.

Here, even assuming that Arias had not waived his right to bring a § 2255 motion, he is not entitled to relief based on his claim that court erred in its calculation of his sentence because it should have been reduced based on his status as a deportable alien. According to the United States, Arias' sentencing issue claims fall outside the parameters of Section 2255, and as such he is not entitled to relief. The United States, in the alternative, argues that even if such claims were cognizable in a § 2255 proceeding, Arias' claim is without merit because Arias' sentence was correctly calculated.

Pursuant to 28 U.S.C. § 2255, a federal prisoner may challenge his conviction on the basis that his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." Section 2255 Motions are reserved for claims of constitutional or jurisdictional significance. *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981); *Limon-Gonzalez v. United States*, 499 F.2d 936, 937 (5th Cir. 1974).

When claims of constitutional or jurisdictional import are not raised on direct appeal, the claims are procedurally defaulted, and can only be considered in a § 2255 proceeding if a movant can show cause for his failure to raise his claims on appeal and actual prejudice resulting from the alleged errors. *United States v. Placente,* 81 F.3d 555, 558 (5th Cir. 1996) ("[A] defendant who raises a constitutional or jurisdictional issue for the first time on collateral review must show both cause for his procedural default and actual prejudice due to any such errors."); *United States v. Gaudet,* 81 F.3d 585, 589 (5th Cir. 1996) ("When raising issues of jurisdictional or constitutional magnitude for the first time on collateral review, a defendant ordinarily must show both cause for his procedural default and actual prejudice resulting from the error."); *United States v. Acklen,* 47 F.3d 739, 741-42 (5th Cir. 1995) ("Because a challenge under section 2255 'may not do service of an appeal,' a movant

16

may not raise constitutional or jurisdictional issues for the first time on collateral review without establishing both 'cause' for his procedural default and 'actual prejudice' resulting from the error."); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) ("A defendant can challenge his conviction after it is presumed final only on issues of constitutional or jurisdictional magnitude ... and may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error."), *cert. denied*, 502 U.S. 1076 (1992). Alternatively, procedurally defaulted claims can be considered for the first time in a § 2255 proceeding if the movant can show that he is actually innocent. *Bousley v. United States,* 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' or actual 'prejudice' ... or that he is 'actually innocent.'"). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley,* 523 U.S. at 614, 118 S.Ct. at 1611.

In this case, Arias has not shown cause or prejudice associated with his failure to raise his sentencing error claim on appeal, nor has he made any showing of actual innocence. Thus, the sentencing error claims Arias raises in this § 2255 proceeding are barred from review.

Moreover, even if the claims were not procedurally barred and Arias had, on direct appeal, argued that the Court erred when it sentenced him, and erred in its application of his guideline sentence by not reducing his sentence based on Arias' status as a deportable alien, such claims, which are based on the District Court's application of the United States Sentencing Guidelines, are not cognizable under § 2255. *United States v. Faubion,* 19 F.3d 226, 232 (5th Cir. 1994) (holding defendant's claim that district court erred in making upward departure under Sentencing Guidelines could not be considered in § 2255 proceeding.); *United States v. Payne*, 99 F.3d 1273, 1281-82 (5th

Cir. 1996) ("A district court's technical application of the Guidelines does not rise to a constitutional issue."); *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1995) ("A district court's calculation under or application of the sentencing guidelines standing alone is not the type of error cognizable under section 2255."), *cert. denied*, 516 U.S. 1165 (1996); *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992)("Relief under 28 U.S.C.A. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice. Nonconstitutional claims that could have been raised on direct appeal, but were not, may not be asserted in a collateral proceeding...A district court's technical application of the [Sentencing] Guidelines does not give rise to a constitutional issue.")(citations omitted).

Finally, even if the sentencing error claims were not procedurally barred, and even if such claims were cognizable in this § 2255 proceeding, no relief would be available on the merits of the claims. In *United States v. Garay*, 235 F.3d 230, 232-22 & n.8 (5th Cir. 2000),, the Fifth Circuit Court of Appeals opined that downward departures based on a defendant's status as a deportable alien are proper only in an extraordinary case, which are "highly infrequent." *See United States v. Foote*, 2001 WL 671465, *3-*4 (N.D.Tex. 2001) (rejecting argument by § 2255 movant that his counsel should have moved for downward departure). Arias' status as a deportable alien, without more, would not have been sufficient to warrant a downward departure. Moreover, Arias' reliance on *United States v. Wills*, 476 F.3d 103, 109 (2nd Cir. 2007), is misplaced. In *Wills*, the Second Circuit vacated the sentence imposed by the district court *because* it relied on the likelihood of the defendant's deportation in sentencing him. According to the Second Circuit, deportation should *only* be considered in special circumstances, namely, "when [the judge] identified, with some particularity,

why a specific defendant is certain to be deported and why deportation, in light of that defendant's individual circumstances, will serve to protect the public." *Id.* at 109. Because Arias' sentencing error claim is procedurally barred and not cognizable in this § 2255 proceeding, and because such claims, even if reviewable, fail on the merits, the claim should be dismissed with prejudice.

## IV. Conclusion and Recommendation

Based on the foregoing, the conclusion that Arias' guilty plea was knowing and voluntary and that his waiver of his right to collaterally attack his conviction should be enforced, and that no relief is available to Arias on the merit of his claims, in any event, it is

RECOMMENDED that the Government's Motion to Dismiss (Document No. 398) be GRANTED, that Movant Arias'"Motion for Downward Departure for Unforeseen Collateral Consequences in Punishment as Alien Not Suffered by Identical United States Citizen", construed as a § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 392) be DENIED, and that this § 2255 proceeding be DISMISSED with prejudice.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile*

19

*Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 21st day of July, 2008.

*Frances H. Stacy*
Frances H. Stacy
United States Magistrate Judge